449 So.2d 253 (1984)
Ronnie Lee JONES, Appellant,
v.
STATE of Florida, Appellee.
No. 62424.
Supreme Court of Florida.
March 29, 1984.
Rehearing Denied May 23, 1984.
*255 Theodore Klein and Joseph H. Serota of Fine, Jacobson, Block, Klein, Colan & Simon, Miami, for appellant.
Jim Smith, Atty. Gen. and Paul Mendelson, Asst. Atty. Gen., Miami, for appellee.
SHAW, Justice.
This is an appeal by Ronnie Lee Jones (hereinafter defendant) from his convictions on three counts of first-degree murder, two counts of attempted first-degree murder, burglary, robbery, carrying a concealed firearm, and unlawful possession of a firearm while engaged in a felony. Defendant was sentenced to death following a jury recommendation that death be imposed. We have jurisdiction, article V, section 3(b)(1), Florida Constitution, and affirm the convictions and the sentences.
On the late night of July 1 and early morning of July 2, 1980, seven men were at the home of John Uptgrow. About midnight, defendant and an unidentified male companion were admitted to the home by Uptgrow. Once inside, defendant removed a concealed firearm from under his shirt and asked Uptgrow for shells. Uptgrow asked why the shells were needed since the firearm was loaded. Defendant asked to speak to Uptgrow privately and the two men went to a bedroom with the defendant walking behind Uptgrow. Within seconds, a gunshot was heard. Uptgrow's body was later found in the bedroom with a gunshot wound to the head consistent with a shot fired from the right rear.
An occupant of the home, Fleming, testified that he was in the bathroom when the first shot was heard. When he started to leave the bathroom, he saw a gunman approaching from the bedroom. The gunman wore clothes similar to those worn by defendant and unlike those worn by his unidentified companion. Fleming retreated into the bathroom and closed the door, whereupon a series of shots were fired through the door into the bathroom. Fleming remained in the bathroom, uninjured, for a period of time until he tried to flee and was shot in the elbow by the gunman; he feigned death and survived.
Two other witnesses, Lynch and McDonald, identified defendant as the man who entered the home, produced a loaded gun, asked for shells, and went to the bedroom with Uptgrow to talk privately. Before the gunshot, defendant's companion was sitting on a couch in the living room; after the shot the companion rose and went toward the bedroom with no visible weapon. After the first shot, another occupant, Hamilton, was seen going to the front door *256 where he turned and said, "Don't do that." Hamilton's body was later found near the door with gunshot wounds. Lynch and McDonald fled through a back door and hid nearby until the police arrived.
Another occupant, Hill, had been asleep on a couch in the living room. His body, with gunshot wounds, was found still on the couch. Another occupant, Smith, was found seriously wounded by a gunshot to the head but could not testify as to the occurrence.
Lynch and McDonald testified that Uptgrow had in his possession a distinctive black pouch containing a large sum of money and that he was wearing gold jewelry. The pouch with the money and the gold jewelry were missing when Uptgrow's body was found. The empty pouch was discovered weeks later hidden in a room which had been occupied by defendant.
Defendant was arrested in the early morning of July 3, 1980, as he was awakening. A distinctive handgun was found under his pillow. Lynch and McDonald testified that the handgun looked like the gun defendant had on the night of the murders.
A fingerprint expert testified that four of defendant's fingerprints were found in the Uptgrow home.
Defendant raises six issues which he argues constitute reversible error. He first urges that the trial court failed to conduct a proper inquiry regarding a waiver of counsel and required him to proceed pro se when he had not effectively waived legal representation. The record shows that a public defender, Zenobi, was appointed on July 17, 1980, at defendant's request and that Zenobi continued as a specially appointed counsel at the request of defendant after Zenobi left the public defender's office in August, 1980. Zenobi was actively engaged in discovery and pretrial motions through March, 1981. Starting in late May, 1981, defendant began filing a series of pro se motions, the contents of which indicated that he was personally assuming direction of his defense. During a series of hearings from May through September, 1981, defendant discharged Zenobi and refused to accept other court-appointed counsel. Instead, defendant requested appointment of counsel of his choice or the provision of $25,000 to obtain counsel. During these hearings, the trial court correctly instructed defendant that he was not entitled to appointed counsel of his choice and that his legal choices were to accept court-appointed counsel, obtain private counsel using his own resources, or represent himself. This impasse culminated at a hearing on September 1, 1981, when trial was set for October 19, 1981. At this hearing, defendant declared he would represent himself but desired the assistance of appointed standby counsel, Kershaw. Defendant advised the court that he would be consulting Kershaw prior to the trial date to obtain assistance in preparing and conducting his defense. The court inquired as to defendant's competence to represent himself and advised defendant that he would be better served if he allowed Kershaw to act as his counsel and to conduct his defense. The court further advised defendant that it was very difficult to conduct a defense, that he was giving up certain rights and would not be able to demand a new trial because of his own ineffectiveness. Nevertheless, defendant insisted, and the trial court having satisfied itself that defendant was competent to exercise his right of self-representation, acquiesced in his decision. This resolution was only temporary. On October 19, 1981, Kershaw appeared before the court to argue that the court had made a Faretta inquiry (Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)), and determined that defendant could adequately represent himself by proceeding pro se and that he should be permitted to withdraw as standby counsel because defendant had refused to talk to him or to make the case file available, and was adamant that he did not want Kershaw associated with him. Kershaw's argument was supported by defendant who stated, "I don't want Mr. Kershaw around me during my trial." The court refused to permit Kershaw to withdraw as standby counsel at that time despite Kershaw's insistence *257 that he was unable and unprepared to represent the defendant due to defendant's uncooperative attitude, but did appoint attorney Wilson to act as standby counsel before the trial commenced the following day.
We are satisfied that defendant by his persistence in demanding counsel of his choice waived his right to appointed counsel and that the court conducted an appropriate inquiry to satisfy itself that defendant was competent to exercise his right to self-representation and was determined to do so. Faretta holds that the sixth amendment grants an accused the right to self-representation. The record affirmatively shows that defendant was literate, competent, and understanding, that he was voluntarily exercising his informed free will, and that the court made it explicitly clear that it thought defendant was making a mistake in refusing to accept the appointment of counsel.
Defendant urges that during the guilt phase of his trial he unequivocally requested appointment of Zenobi, Kershaw, or other counsel and that the trial court erred in not appointing counsel at that time. Defendant's argument is without merit. This request occurred on the second day of trial, after the jury was selected and after the state had commenced its case. The request for counsel was accompanied by a motion for a continuance. The trial court properly advised defendant that he had previously fired court appointed counsel, refused other counsel, and had chosen to exercise his constitutional right to represent himself after a proper inquiry. The court properly exercised its discretion in refusing to permit the defendant to delay the proceedings further by withdrawing from that choice during the course of the trial. As we make clear below, neither the exercise of the right to self-representation nor to appointed counsel may be used as a device to abuse the dignity of the court or to frustrate orderly proceedings.
In support of his argument that the trial court did not conduct a proper inquiry into waiver of counsel, defendant urges that the appointment of standby counsel to observe the trial was ineffectual because standby counsel refused to offer advice when requested to do so. The record clearly shows that the court was faced with an obstreperous defendant who might well attempt to disrupt and obstruct the trial proceedings. Under these circumstances, it was prudent of the court to appoint standby counsel, even over defendant's objection, to observe the trial in order to be prepared, as well as possible, to represent defendant in the event it became necessary to restrict or terminate self-representation by shackling and gagging defendant or by removing him from the courtroom. We do not view the appointment of standby counsel over defendant's objection as interposing counsel between defendant and his sixth amendment right to self-representation. At one point during cross-examination of a witness, when defendant appeared to be opening up a subject which it was in his interest to avoid, the trial court on its own volition suggested that defendant consult with standby counsel. Attorney Wilson, not being familiar with the case or the purpose of the cross-examination, declined to advise defendant. This was understandable because defendant had refused to cooperate by familiarizing Wilson with the case or with defendant's trial strategy. The inability of counsel to prepare for trial and offer such assistance as defendant might request was not due to any action of the court or of the standby counsel. The fault lies squarely on defendant and his refusal to cooperate with the court and court-appointed counsels in their efforts to provide legal assistance. We note also that the court did not curtail the cross-examination and recognized the right of defendant to conduct his defense as he wished.
Defendant's behavior and attitude posed continuing problems for the trial court, concerned as it was with preserving both defendant's constitutional rights and the right of the state to an orderly and timely trial. We have no criticism of the trial judge's conduct of the trial. On the *258 contrary, given the contumacious behavior of defendant, the judge struck an admirable balance which preserved both defendant's and the state's rights. Nevertheless, for the guidance of other courts, we have two comments. First, whatever his motivation, defendant burdened and delayed the court by his vacillation in not unequivocally choosing between court-appointed counsel, proceeding pro se, or obtaining his own counsel of choice. Instead, defendant persistently demanded that to which he was not entitled  counsel of his choice provided by the state. As a matter of guidance, defendants who without good cause refuse appointed counsel but do not provide their own counsel are presumed to be exercising their right to self-representation. They should be so advised and the trial court should forthwith proceed to a Faretta inquiry. Second, the appointment of standby counsel, under Faretta, is constitutionally permissible; it is not constitutionally required. Goode v. State, 365 So.2d 381 (Fla. 1978), cert. denied, 441 U.S. 967, 99 S.Ct. 2419, 60 L.Ed.2d 1074 (1979). Faretta recognizes that the trial court may, over a defendant's objection, "appoint `standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary." 422 U.S. at 835 n. 46, 95 S.Ct. at 2541 n. 46. Defendant here negated any possibility that either Kershaw or Wilson could offer legal advice by refusing to cooperate with them. A lawyer whose only knowledge of the case is based on sitting in the courtroom observing the trial cannot realistically be expected to offer sound legal advice to a defendant. Under these circumstances there is no merit to defendant's argument that the refusal of standby counsel to advise him amounted to a denial of counsel.
Defendant also argues that the trial court erred by not providing appointed counsel during the sentencing phase of the trial. Following the jury verdict of guilt, the jury was excused until the following morning and the court announced that it would conduct a hearing at that time on the proposed jury instructions for the penalty phase. At that hearing, defendant presented a motion for appointment of private counsel and requested that the court grant $25,000 for the purpose of obtaining such counsel. The trial court pointed out to defendant that numerous competent attorneys had been previously appointed, that he had discharged all of them, that he was not entitled to the appointment of an attorney of his choice, that he had chosen to represent himself, and that they were now in the middle of the trial. Defendant stated in support of his motion that all the appointed lawyers were incompetent. Defendant now urges that the trial court failed to renew the offer of counsel at the sentencing stage and that this constitutes reversible error. We disagree, as this would exalt form over substance. It is clear from the record that the issue of counsel was before the court and that defendant was merely repeating his earlier meritless arguments that he was entitled to a lawyer of his choice. We note also that in capital punishment cases, the penalty phase requires the participation of the sitting jury and follows immediately upon the guilt phase. The issue is not squarely presented here of whether a defendant in a capital punishment case may elect to proceed pro se in the guilt phase and then obtain appointment of counsel and a continuance of an ongoing trial while the newly-appointed counsel familiarizes himself with the case. We are prepared to say, however, and do so in order to forewarn future defendants, that both the state and the defendant are entitled to orderly and timely proceedings. Florida's capital punishment law, which has been repeatedly upheld, contemplates that the sentencing phase will follow on the guilt phase, using the same jury. Faretta explicitly recognizes that:
The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law. Thus, whatever else may or may not be open to him on appeal, a defendant who elects to *259 represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of "effective assistance of counsel."
422 U.S. at 835 n. 46, 95 S.Ct. at 2541 n. 46 (emphasis supplied). We consider it implicit in Faretta that the right to appointed counsel, like the obverse right to self-representation, is not a license to abuse the dignity of the court or to frustrate orderly proceedings, and a defendant may not manipulate the proceedings by willy-nilly leaping back and forth between the choices.
Defendant complains that he was greatly prejudiced and thereby denied his constitutional right to a fair trial when he was chained to his chair in the presence of the jury. We disagree. On October 19, 1981, out of the presence of the jury, defendant was held to be in contempt of court for interrupting other speakers and refusing the court's instructions to await his turn to speak. On October 21, 1981, during the presentation of the state's case, defendant attempted to argue a motion for mistrial in the presence of the jury. The jury was then excused and defendant attempted to argue various motions which had been previously argued, whereupon the following exchange took place:
THE COURT: I'm not going to hear any motions that another judge already heard. That motion has been already heard by Judge Orr, and that has been ruled upon, by Judge Orr.
Mr. Jones, it's very simple. We are proceeding and we are proceeding now.
THE DEFENDANT: That's easy for you to say.
I tell you lady, I can always interrupt the State prosecutor and as far as me being here, I wouldn't let the trial proceed. So if you have to move me from the courtroom you have the trial without my presence.
THE COURT: Mr. Jones, you are an intelligent human being 
THE DEFENDANT: Yes.
THE COURT: Mr. Jones, we are going to proceed. You are an intelligent human being. You made a choice to represent yourself, and I would hope that you conduct yourself in an appropriate manner befitting yourself, and that we proceed in an orderly fashion, because that would be in your best interest.
However, if you choose not to do that, the only person you are hurting is yourself in the eyes of the jury. It is not going to affect me in any way, but your behavior might affect the outcome of the trial in the eyes of the jury.
I cannot prevent any action that you take yourself, only you can guide yourself in an appropriate fashion and make objections in a manner befitting a human being who is representing himself. You certainly should make objections whenever they are appropriate, and make them in a gentlemanly fashion, and in an orderly fashion.
Sir, it is up to you.
THE DEFENDANT: Your Honor, I'm quite sure everyone is intelligent, but everyone has a little stupidity in them. There is a time when ignorance has to be shown. But as far as you saying showing interest on my behalf, that's a lie. That's been a lie since the day the State prosecutor got the evidence of the case.
THE COURT: We are going to proceed now.
Mr. Jones, please have a seat.
THE DEFENDANT: Like I told you, your Honor, it is not going to be no procedure of this trial, not while I am present.
THE COURT: Please have a seat, Mr. Jones.
THE DEFENDANT: As far as the State prosecutor, they don't have no business going out talking to a witness or taking depositions.
Ms. Kahgan took depositions of a witness at their home. Is that legal?
THE COURT: Mr. Jones, please have a seat.
I'm giving you a direct order before the jurors come back.

*260 THE DEFENDANT: You can give me six months and you are not finished giving me contempt.
THE COURT: Are you asking me to give you more?
THE DEFENDANT: That's your job if you feel you have to do that.
THE COURT: Mr. Jones, I am giving you a direct order at this point, which is to please have a seat. Let's do that now.
THE DEFENDANT: You Honor, well 
THE COURT: Let the record reflect that the defendant is still not having a seat and that he is still  even though there have been recesses, and he has had opportunities to think about it, we are still not able to conduct this trial in an orderly fashion, and we are still waiting for Mr. Jones.
THE DEFENDANT: Yes 
THE COURT: Mr. Jones 
THE DEFENDANT: Justice  the Court won't give me a fair trial.
THE COURT: For the fifth time, please have a seat, sir.
THE DEFENDANT: I will have a seat, your Honor, but how can you stop me from talking?
THE COURT: This is your choice. You are not going to have a seat in an appropriate fashion like you are supposed to, then I'm going to be forced to take other action.
Now, are you going to act in an intelligent fashion, or are you 
THE DEFENDANT: Your Honor, I am acting in an intelligent manner.
THE COURT: Do you need to be shackled?
THE DEFENDANT: Does that stop me from talking?
THE COURT: I'm not trying to stop you from talking. I am merely asking you to please have a seat at the defense table, and if you don't have a seat at the defense table, I am going to shackle you there.
THE DEFENDANT: I am not finished arguing, your Honor.
THE COURT: I have ruled.
You have a new motion? I have already ruled on your other motion?
THE DEFENDANT: As far as 
THE COURT: Do you have a new motion, Mr. Jones?
THE DEFENDANT: That won't stop me from turning over the table or talking to the jurors, would it?
THE COURT: If you do that, you would be creating the problems yourself in the eyes of the jury.
THE DEFENDANT: I wouldn't be creating the problem. You know for yourself that there have been delays as far as continuances in this case. The State prosecutor could take a vacation and get a continuance.
THE COURT: Mr. Jones is not following the directions of this Court.
Is there any reason why you should not be found in contempt of Court, Mr. Jones?
THE DEFENDANT: Yes, ma'am; because I'm trying to argue my rights of freedom in my due process of law.
THE COURT: Anything further?
THE DEFENDANT: I have tried to show you some of the evidence in the case what the State has furnished to me, that is beneficial to me.
THE COURT: Anything further?
THE DEFENDANT: But, you won't listen to it.
THE COURT: I find you in contempt of Court, and sentence you to six months consecutive to the previous contempt of Court, consecutive to any other previous sentences that you have been sentenced to.
Now, for the last time 
THE DEFENDANT: Your Honor, you haven't finished giving me contempt 
THE COURT: Please shackle him to the chair.
(Thereupon, the defendant was shackled to the chair:)
THE DEFENDANT: Your Honor, I talked to Mr. Crawford, and he told me *261 that officers aren't supposed to put their hands on me.
THE COURT: Please bring the jurors out.
(Thereupon, the following proceedings were had in the presence of the jury:)
THE COURT: Okay, the jurors are all now present and so is the defense and the State.
Will the State please call their next witness?
THE DEFENDANT: I would like to question the jurors, your Honor.
THE COURT: On what point of law, sir? What area?
THE DEFENDANT: I would like to question them on a point that you don't want me to say.
THE COURT: It's going to wait. We are going to proceed.
THE DEFENDANT: It can't wait.
THE COURT: It will wait.
THE DEFENDANT: It might be beneficial as far as the trial being a mistrial.
THE COURT: We are going to proceed with this witness now.
Please raise your right hand and be sworn.
THE DEFENDANT: Jurors  do you see how they treat me? They handcuff me, because I'm standing up for my rights and talking up for my rights.
THE COURT: Please have a seat, sir.
THE DEFENDANT: I would like to ask the jurors a question.
THE COURT: Okay, let's trade chairs 
THE DEFENDANT: Your Honor, that couldn't stop me from talking.
THE COURT: Trade chairs.
(Thereupon, the defendant was moved to another chair:)
THE COURT: Has the witness been sworn?
THE DEFENDANT: There won't be a trial.
Thereupon: DAVID LYNCH was called as a witness on behalf of the State, sworn, and testified as follows:
THE DEFENDANT: (Defendant singing).
She knows damn well I am supposed to get a mistrial.
What person is going to look at the headline of a paper and don't read it? Ma'am, you are crazy.
She even said don't read in the papers or look at the papers 
THE COURT: All right, let's try to proceed. You may proceed, Mr. Laeser, sir.
Please talk loud and clear. You are going to have to speak up very loudly. Let's Proceed.
The direct examination proceeded without further interruption following which the court asked:
THE COURT: Is there any cross?
THE DEFENDANT: I'd like to cross-examine the witness, and I'd like to say that I will conduct myself in a manner respectable if I am unhandcuffed.
THE COURT: All right, please, let's remove the `cuffs and let's proceed.
The record clearly shows the utter lack of merit in defendant's argument. Whatever prejudice defendant suffered resulted from his own willful attempt to disrupt, indeed stop, the orderly proceedings of the court. The trial court's action in shackling defendant was justified. As the United States Supreme Court said:
It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations. We think there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant like Allen: (1) bind and gag him, *262 thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly.
Illinois v. Allen, 397 U.S. 337, 343-44, 90 S.Ct. 1057, 1060-61, 25 L.Ed.2d 353 (1970).
Binding or shackling the defendant is not only a constitutionally permissible method of handling an obstreperous defendant but, under the circumstances here, it was the least restrictive method available to the trial court. Defendant now urges that shackling was not only prejudicial but was inappropriate since defendant could continue to orally obstruct the proceedings. This is the same argument which defendant defiantly made to the trial court. The obvious answer to that argument is that the shackling worked and, had it not worked, the court could have ordered more restrictive measures. After his outburst of song when the jury returned, defendant conducted himself properly during the direct examination and agreed to conduct himself properly thereafter, at which point he was unshackled. Had he not done so, we assume the court would have resorted to the more restrictive methods of binding and gagging or removal from the courtroom.
Defendant's third issue challenges the trial court's failure to find a violation of the speedy trial rule. Defendant filed a motion for a speedy trial on June 2, 1981, and a motion for discharge because of speedy trial violation, on August 3, 1981. The trial court conducted a hearing on these motions on August 31, 1981, and issued an order dated September 17, 1981. The trial court found that defendant was not continuously available for trial during the speedy trial period because of the filing of a motion to be psychiatrically examined and the filing and arguing of numerous other pleadings, including demands for discovery. The trial court concluded that there was clear evidence that defendant had not diligently investigated his case and was not timely prepared for trial at the time his demand for speedy trial was filed. We agree with the trial court. The record shows that during the period of May 26 to June 2, alone, defendant filed seventeen written pro se motions and one memorandum of law. These motions covered a variety of subjects: appointment of counsel, para-legals, various experts, and investigators; suppression of evidence; bill of particulars; striking of evidence; discovery; and production of evidence. (At least in part, these pro se motions duplicated the earlier efforts of court-appointed counsel during the period of July, 1980, through May, 1981. Defendant was apparently acting under the assumption that he could fire his counsel and start afresh without reference to previous actions of his counsel.) We note also that during this period and continuing until September 1, 1981, defendant was engaged in firing and rejecting court-appointed counsel and attempting to obtain appointment of specifically named counsel.
Florida Rule of Criminal Procedure 3.191(c) provides that "[a] demand for speedy trial shall be deemed a pleading by the accused that he is available for trial, has diligently investigated his case, and that he is prepared or will be prepared for trial within 5 days." It is patently clear from the record that defendant was not prepared for trial on June 2, 1981, and could not be prepared within five days. The demand for speedy trial was spurious. We long ago rejected the notion that a defendant could "control the criminal docket by merely filing spurious demands for the speedy trial for which he is not, in fact, prepared." State ex rel. Hanks v. Goodman, 253 So.2d 129, 130 (Fla. 1971). State ex rel. Ranalli v. Johnson, 277 So.2d 24 (Fla. 1973); Turner v. State ex rel. Pellerin, 272 So.2d 129 (Fla. 1973). Defendant's argument is without merit.
Defendant next argues that the trial court erred by permitting a state witness to testify as to the plea negotiations entered into by defendant and by permitting the prosecutor and a state witness to comment on the failure of defendant to take a polygraph examination. We address these issues together. The record shows that defendant voluntarily approached the *263 chief investigator in the case, was given a Miranda warning, and stated that he did not want his lawyer present. The chief investigator advised defendant that he could not make any bargains but would advise the prosecutor of any statements made or evidence developed, and that defendant agreed to take a polygraph test in order to verify his truthfulness, later declining to do so. Defendant made a number of contradictory statements to the chief investigator which were partially inculpatory and partially exculpatory, but none of which directly implicated defendant in the murders. We note initially that this incident occurred months before defendant expressed dissatisfaction with and discharged his original appointed counsel. Thus, defendant's approach to the chief investigator was an early manifestation of his belief that he could handle his own case without the assistance of legal counsel and would do so against the advice of counsel. In any event, no objection was made at trial to the testimony of the state witness on the plea negotiations or to the comments of the witness or prosecutor on defendant's refusal to take a polygraph examination. Thus, the issue was not preserved for appeal. Castor v. State, 365 So.2d 701 (Fla. 1978). We note that even had the issue been preserved for appeal by a contemporaneous objection, the error would have been harmless in light of the fact that other evidence supporting the convictions is overwhelming. United States v. Hasting, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983); Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Odom v. State, 403 So.2d 936 (Fla. 1981), cert. denied, 456 U.S. 925, 102 S.Ct. 1970, 72 L.Ed.2d 440 (1982).
Finally, defendant urges that there was insufficient evidence linking him to the murders. This argument is without merit and requires no further comment.
In addition to reviewing the specific arguments raised by defendant, we have also reviewed the record pursuant to Florida Rule of Appellate Procedure 9.140(f) and conclude that a new trial is not required.
Defendant raises no issues concerning his death sentence. The jury recommended by an 11-1 majority that defendant be sentenced to death. The trial judge entered a written order imposing the death penalty based on six aggravating and zero mitigating factors. Of these six aggravating factors, four were common to all three murders, the fifth factor was applicable only to the Uptgrow murder, and the sixth factor was applicable only to the murders of Hamilton and Hill. We find that factor five, murder for pecuniary gain, impermissibly doubles up factor three, murder committed while engaged in, or during the flight after, the commission of a robbery and burglary. The error was harmless. Vaught v. State, 410 So.2d 147 (Fla. 1982).
In sum, we find that the trial court properly found five aggravating factors and no mitigating factors. The facts supporting the convictions and sentences of death are clear and convincing and are established beyond a reasonable doubt.
It is therefore our opinion that the judgments and sentences should be affirmed.
It is so ordered.
ALDERMAN, C.J., and ADKINS, BOYD, OVERTON, McDONALD and EHRLICH, JJ., concur.