791 So.2d 1105 (1999)
Steven LANGON, Appellant,
v.
STATE of Florida, Appellee.
No. 98-0215.
District Court of Appeal of Florida, Fourth District.
July 28, 1999.
*1106 James L. Eisenberg, West Palm Beach, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and James J. Carney, Assistant Attorney General, West Palm Beach, for appellee.

ON MOTION FOR REHEARING
STONE, J.
Appellant's motion for rehearing is denied. However, we republish our opinion, with two corrections, as follows:
We affirm Appellant's conviction and sentence for first-degree murder with a firearm, attempted robbery with a firearm, aggravated assault with a firearm, and carrying a concealed weapon.
Langon contends that his Sixth Amendment right to assistance of counsel was violated because of the court's failure to conduct a complete inquiry to determine a knowing and intelligent waiver of such right. He also asserts that his rights to assistance of counsel and to a fair trial were compromised by the court's denial of a continuance prior to trial.
In 1990, Langon was convicted of these same charges, but this court overturned that conviction and remanded for a new trial. Langon v. State, 636 So.2d 578 (Fla. 4th DCA 1994). In June 1994, the trial court determined that lead counsel from the first trial, Anthony Natale, would be retained for the second. However, in July 1994, the trial court heard Natale's motion to withdraw in the first of a string of similar motions stretching over many years. Natale had irreconcilable differences with Langon and submitted a sealed affidavit as to the specifics. Langon confirmed that he wanted Natale to withdraw. The trial court rejected Natale's suggestion that Nelson Bailey, the second chair counsel in the first trial, be appointed to the case, and instead appointed Joe Atterbury. The trial court subsequently granted two motions by Atterbury for continuances. In January 1995, the trial court appointed Jorge Labarga as second chair.
In March 1995, with the trial set for April 3, Langon filed a pro se motion to discharge counsel, claiming that Atterbury's representation fell below the standards of professional conduct due to the manner in which he pursued a motion to suppress, his failure to file a motion to dismiss certain underlying charges, his failure to file a motion in limine, and his failure to investigate circumstances to effectively pursue an intoxication defense at trial. At a hearing on the motion, Atterbury asked to be discharged from the case based on the fact that Langon was refusing to discuss the case or work with him. The trial court informed Langon that he did not "get to just get two weeks from trial and say, I don't like my lawyer, and we start all over again." The trial court gave Langon a choice from the four lawyers who had worked with him previously, Atterbury, Labarga, Bailey, or Natale. Langon chose Bailey.
Bailey requested that Labarga remain on the case as second chair and asked for a few additional months to prepare. The trial court replied:

*1107 Okay. Here's what we're going to do, Mr. Langon, let me be perfectly clear about this today. As I said before, I don't think you've stated grounds to get Mr. Atterbury off the case and I'm so finding. But I'm going to permit Mr. Bailey to because, at this point, he's probably equally prepared.
But I'm not going to play games with you. For any reason, we get close to trial, all of a sudden you decide Mr. Bailey is not the choice for you, you will have two choices, either represent yourself or Mr. Atterbury comes back into the case having prepared it.
A few weeks before an October trial date, the trial court allowed Bailey to withdraw from the case due to his appointment to the county court. Labarga was then appointed as lead counsel. The trial court later allowed Labarga to withdraw because he was appointed to the circuit court. About that time, the trial court also permitted counsel, Jack Goldberger, to withdraw based on Goldberger's claim that it would be inappropriate for him to represent Langon when Atterbury, his partner, had previously withdrawn due to a conflict. The trial court then appointed Thomas Montgomery and continued the trial until August 12, 1996.
In May 1996, Langon filed a pro se motion requesting that the court remove Montgomery from the case due to an "ongoing conflict." Montgomery moved to withdraw, stating that Langon refused to see him at the jail, refused to discuss his case, refused to reply to written communications, and created a conflict by filing a writ in this court to have Montgomery removed. The trial court granted Montgomery's motion and appointed Michael Salnick as counsel. The trial court again continued the trial until February 7, 1997.
In December 1996, the trial court held a hearing on Salnick's motion to withdraw from the case. Salnick moved to withdraw at Langon's request. Langon claimed that he did not trust Salnick or feel that Salnick was keeping commitments he made to him. Salnick did not agree with Langon's representations. The state reminded the court that several of the previous attorneys on the case had run into problems similar to those encountered by Salnick and asserted that Langon was manipulating the system. The trial court denied Salnick's motion, stating, "The manipulation must end." (emphasis supplied)
Salnick later filed a motion for continuance based on the fact that Langon refused to see and cooperate with him until the jail made a change in Langon's housing. The court granted the motion but found that Langon had been "manipulative of the system in the extreme." The trial court made "a sort of plea" to Langon to cooperate with Salnick.
In January 1997, Langon filed a pro se motion to discharge Salnick. Salnick informed the court that he had no attorney-client relationship with Langon because Langon refused to see him or anyone from his office. Salnick stated that James Eisenberg would be willing to take the case. Langon stated that he would cooperate with Eisenberg as best as he could. The court warned:
I am of the mind to sort of go against my commitment of the last hearing which I felt very strongly about, of forcing Mr. Salnick to go to trial and appointing Mr. Eisenberg.
But if another circumstance develops like we have had now with Mr. Salnick and you decide that you are going to stop cooperating, I will then indeed go forward with the trial. Do you understand that I am committed to that now, and that is my decision?
*1108 Langon stated that he understood. The court clarified:
You have had a lot of litigation and a lot of requests.
* * *
And I said to you before and I say to you again, you have at least with the Court been articulate and restrained and not problematic in your presentation of your grievances.
* * *
And as I warned you this morning or cautioned you-whichever is the most appropriate-if you accept Mr. Eisenberg, maybe even if you don't, I am going to move forward with this lawsuit and we are going to get it, it tried.
* * *
You have been through, as I said this morning, a laundry list of our finest defense lawyers, and I mean they are good.
* * *
So, having cautioned you about that, it is up to you to tell me, are you ready to move forward with Mr. Eisenberg?
THE DEFENDANT: Yes, Your Honor, I am ready to move forward with Mr. Eisenberg.
THE COURT: Okay. And do you understand that if you should change your mind-and I hope you won't, I want you to be satisfied with him, and I think you will be-but I will make you move forward anyway. Do you understand that is a commitment from the Court?
Langon agreed. The case was reset for trial twice thereafter.
On May 27, 1997, Eisenberg filed a motion to withdraw. According to Eisenberg, inmates with counsel were entitled to only one hour per week in the jail law library while other inmates were allowed twice that much. Langon wished to spend more time in the law library, and if this extra time were denied him, he wished to proceed pro se. Langon then filed a pro se "amended motion to allow counsel to withdraw and to allow defendant to represent himself." At the hearing on these motions, the following exchange took place:
MR. EISENBERG: Mr. Langon, as the Court knows, is literate, he's a very intelligent man. He's doing his own litigation in Civil Court. He's written a million motions. He's very understanding of the legal process. He's educated and he-certainly, there is no question, I think, that he's competent to represent himself, which is the only issue.
THE COURT: You have provided the Bowen case to Mr. Langon?
MR. EISENBERG: I have provided it to Mr. Langon.
* * *
THE COURT: Tell us your name and age, please.
THE DEFENDANT: My name is Steve Langon. I am 54 years old, Your Honor.
THE COURT: Mr. Langon, it is your desire, you're telling me here today, to discharge Mr. Eisenberg?
THE DEFENDANT: That is correct.
THE COURT: All right. And you have read this Bowen case, which is, as we have said, the most recent pronouncement and you understand it and it is in the light of your knowledge and understanding of that case that you make this request?
THE DEFENDANT: Yes, Your Honor.

*1109 THE COURT: All right. I don't see any reason why I should delay the trial and I want you to be thinking about that while I visit with the State to ask for her response.
Thereafter, Langon asked for a three month continuance. The court told Eisenberg:
I can't imagine a more unreasonable request than that in all of my years of experience, based on the regrettable, perhaps even shocking chronology of this case for which you're not responsible, clearly.
Mr. Langon, it is my finding and my ruling that you are one of the most manipulative defendants or litigants that I have ever experienced and I have seen a few. We are all manipulative, Mr. Langon, Judges, lawyers, court reporters, all of us manipulative, that's what people do in life. So I don't mean that in some despicable or excessively derogatory fashion. I just mean that you have skillfully and perhaps more adroitly than many, many others, delayed your case, delayed your case, and delayed your case and in the eyes of many, that might be considered a compliment, an accomplishment of skill to have delayed the case so long.
But the history of this case, the chronology of this case, compared against any, in my memory, is the highest and most astonishing and shocking of any that I have ever encountered.
My only concern is that you understand today, if you come in on the morning of your trial and say, I have changed my mind, I want a lawyer, it will be like the person who has demanded a speedy trial and then changed his mind; the dye is cast as of today, Mr. Langon.
Do you understand that?
THE DEFENDANT: Yes, I do, Your Honor.
THE COURT: And this opinion provides-in addition, I think, the key holding is the competency that of the defendant seeking to waive his right of counsel, is competent to waive his right, not competent to represent himself, and the Court continues that it is within your right, if you choose to sit mute and mouth no defense at all.
If in the middle of the trial you start coming to me with requests for subpoenas, you have to do that yourself, Mr. Langon, and this case with which I have some reservation, but I am not the Court, in effect, let me become Pontius Pilate as I see it, and just wash my hands of responsibility and I will try to give you the same courtesy in trial that I would give to Mr. Eisenberg, Ms. Duggan and any other lawyer, but no more and no less and you need to understand that.
So, you['ve] been, I think, cautioned by me that you need an attorney to represent you and you have chosen to ignore that caution, which you have the right to do according to my higher and superior courts.
I just want you to know, on the morning of your trial, I will not permit you to change your mind and say, I wish to now have a lawyer, and if that's error, then if there is a conviction, some court will tell me later on that it was error. I intend to get this case tried and I have given you the many warnings about that.
The court also stated that he would ask the sheriff to give Langon more time in the law library.
At a status conference on July 2, 1997, Langon moved for access to video tapes and his files, as well as increased access to the law library. Langon also moved for a continuance in order to review these items and prepare for trial. At the hearing, the *1110 state gave Langon a copy of the version of the video it planned to use at trial. The court denied Langon's motion for a continuance and instructed the sheriffs office to bring the tapes and files to Langon's cell. On July 7, 1997, the day of the trial, Langon again moved for a continuance. The trial court denied his motion.
The evidence at trial included a videotape of the 1990 crime in progress. The tape showed that Langon entered a drug store, approached, and vaulted over, the counter of the pharmacy. Security guards approached, and one guard sprayed mace at him. Langon pulled out a revolver and said, "Son of a bitch." The officer dropped to the floor and covered his head with his hands. Langon then shot him in the head and the guard died immediately. After pointing the gun at the second officer, Langon fled.
Officer Canita of the sheriffs office recognized Langon as a neighbor of his when he saw a video of the shooting on television. After Langon was apprehended, he was identified in a police lineup by Canita and three eye witnesses.
After the state presented its evidence, the following transpired:
THE COURT: All right, now at this juncture, Mr. Langon, the Defense moves for a Judgment of Acquittal or reduction in the charges to lesser included crimes and you are permitted to do that if you choose to do so.
THE DEFENDANT: My position at this time, because I am not familiar with the proceeding, is to ask the Court for a lawyer to help me with these proceedings to assist me.
THE COURT: I believe that comes a little late.
THE DEFENDANT: I am not knowledgeable enough to continue myself.
THE COURT: ... [R]emember I told you when you elected to represent yourself, that in my personal opinion, which is not anything but my own little personal opinion, you were making a mistake and that I wanted you to have Mr. Eisenberg because I thought he understood the case and had some rapport with you.
* * *
THE DEFENDANT: ... I can reassert my position and will cite some case law here under Faretta. It stated here that the Court recognized that the 6th Amendment Right to Assistance of Counsel in conflict embodies a correlated right to dispense a lawyer's help.
I could reopen and renew my asking of a Court for assistance of counsel at any time when I feel I am not knowledgeable to proceed.
I feel at this time I am not knowledgeable enough to proceed with the proceedings at hand at this time.
It also states in the Rules of Criminal law here, cited at 3.111D, states here that the-excuse me for a minute. D5, that a waiver is accepted at any state of the proceedings, the offer of assistance of counsel shall be renewed by the Court at each subsequent stage of the proceedings at which the Defendant is without counsel.
The court refused to provide Langon counsel based on its finding that the court "thoroughly told you that you should have a lawyer; that Mr. Eisenberg was thoroughly comfortable in trying cases, and furthermore knew you, and that you were making a mistake." The court also emphasized "that I told you that once you relinquished that lawyer that was it and you couldn't throughout the trial say: Well, today I want to be the lawyer, the next day say I cannot." Langon was convicted *1111 of all the crimes charged. The court subsequently appointed a public defender for the sentencing proceedings and for appeal.
It is well established that once a defendant asserts the right of self-representation, the court must determine whether the defendant has knowingly waived his or her right to counsel. See Rogers v. Singletary, 698 So.2d 1178 (Fla. 1996); State v. Young, 626 So.2d 655, 656 (Fla.1993). The court must also ensure that the defendant is competent to make the choice. See State v. Bowen, 698 So.2d 248 (Fla.1997), cert. denied, 552 U.S. 1081, 118 S.Ct. 865, 139 L.Ed.2d 763 (U.S.Fla. 1998). Florida Rules of Criminal Procedure 3.111(d)(2) and (3) provide:
(2) A defendant shall not be deemed to have waived the assistance of counsel until the entire process of offering counsel has been completed and a thorough inquiry has been made into both the accused's comprehension of that offer and the accused's capacity to make an intelligent and understanding waiver.
(3) No waiver shall be accepted if it appears that the defendant is unable to make an intelligent and understanding choice because of a mental condition, age, education, experience, the nature or complexity of the case or other factors.
Recently, the supreme court discussed the standard of review to be applied:
A defendant's demand for self-representation places the trial court in a quandary, for the court must balance seemingly conflicting fundamental rights-i.e., the court must weigh the right of self-representation against the rights to counsel and to a fair trial. Because the court's ruling turns primarily on an assessment of demeanor and credibility, its decision is entitled to great weight and will be affirmed on review if supported by competent substantial evidence in the record.
Potts v. State, 718 So.2d 757, 759 (Fla. 1998).
Here, the trial court's formal inquiry was less than thorough. However, the record clearly indicates that Langon knew what he was doing, that his decision was taken with his eyes wide open, and that the trial court was thoroughly familiar with Langon's capacity to understand and make this decision. In Fitzpatrick v. Wainwright, 800 F.2d 1057 (11th Cir.1986), the Eleventh Circuit held that the failure to hold a formal waiver hearing did not mandate reversal where the record showed that the defendant understood the risks of a pro se defense.
Similarly, in Waterhouse v. State, 596 So.2d 1008 (Fla.1992), the supreme court recognized that the failure to conduct a formal waiver hearing did not mandate reversal where the defendant's conduct throughout the proceedings made it apparent that he was knowledgeable about the proceedings. Id. at 1014. Waterhouse had filed motions in his own behalf with citation to supporting cases, addressed the court at length during motion hearings, citing and discussing cases, and took an active part in his defense by giving the court the names of witnesses he wished to call, presenting counsel with questions for witnesses, and raising objections to testimony. Id. The trial court had warned Waterhouse on numerous occasions as to the dangers of self-representation and had made a finding on the record that Waterhouse had been discharging attorneys over the years purely for purpose of delay. Id. at 1014-15. This information compelled the supreme court to conclude that the requirements of Faretta had been met. Id.
In this case, the record establishes that Langon was extremely involved in his defense, *1112 so much so that he wished to discharge one of his attorneys solely to allow him more time in the law library. His interactions with the court and his pleadings of record demonstrate that he was educated and intelligent. Moreover, the record reflects that Langon had drafted and argued numerous pro se motions, wherein he cited and discussed cases, to the court. The record also establishes that Langon was well aware of the law of his case, the full extent of the case against him, his possible defenses, and the law surrounding a waiver of counsel. He was also familiar with the complexity of these particular criminal proceedings, having been through them before at the first trial. Also, significantly, as in Waterhouse, Langon's manipulation of the proceedings indicated an obvious understanding of the process that need not be ignored.
We recognize that this court has noted that despite a trial court's personal familiarity with a defendant, Faretta still requires the trial court to make a sufficient record indicating how the defendant's background, including his age, mental status, and education, affects his competency to waive his right to counsel. See Beaton v. State, 709 So.2d 172 (Fla. 4th DCA), cause dismissed, 718 So.2d 166 (Fla.1998); see also Wilson v. State, 724 So.2d 144 (Fla. 1st DCA 1998); Mitchell v. State, 407 So.2d 1005 (Fla. 5th DCA 1981). However, here, as in Waterhouse, the defendant's competency to waive was otherwise established on the record. See, e.g., Burton v. State, 596 So.2d 1184 (Fla. 1st DCA 1992)(noting that the record contained nothing to suggest that the trial court had any information regarding the defendant's mental condition, age, education and past history). Additionally, both the chronology of the case and the record establish that the trial court had more than a mere general familiarity with the defendant. In light of the record, the trial court did not abuse its discretion in finding the waiver valid.
Langon also argues that the trial court erred by failing to renew the offer of assistance of counsel at each subsequent stage of the proceeding, such as before voir dire, or before the presentation of evidence.
Recently, in Watson v. State, 718 So.2d 253 (Fla. 2d DCA 1998), the Second District concluded that the trial court did not err by proceeding to trial after determining that the defendant had forfeited his right to counsel after the withdrawal of six different court-appointed attorneys. Id. at 254. The appellate court did, however, reverse as to the sentence because the trial court failed to renew the offer of assistance for the sentencing hearing (a subsequent stage), a circumstance not applicable here. Id. Similarly, in Lamb v. State, 535 So.2d 698 (Fla. 1st DCA 1988), the First District concluded that the trial court did not err by failing to renew the offer of assistance of counsel at the beginning of trial where the trial court had adequately done so at a pretrial hearing on the waiver of counsel three weeks prior. Id. at 698-99. The court determined the waiver was for the critical stage of trial, and "[s]ince there was no change in that critical stage, rule 3.111(d)(5) does not come into play." Id. at 699.
We are mindful that in Sproule v. State, 719 So.2d 349 (Fla. 4th DCA 1998), this court distinguished Lamb and held that the court was required to renew the offer at the beginning of trial where the defendant waived counsel at a pretrial motion hearing but was before the court on two additional occasions prior to trial. Id. at 350. However, to apply Sproule here would serve no purpose other than to exalt form over substance in applying rule 3.111(d)(5). In State v. Roberts, 677 So.2d *1113 264 (Fla.1996), the supreme court stated, "We agree that under normal circumstances, rule 3.111(d)(5) requires a trial court to advise a pro se defendant of the right to counsel at each subsequent stage of trial. However, to apply the rule strictly in this case would produce an absurd result." Id. at 265.
In Roberts, the defendant had already caused one mistrial during his first trial. Id. He had also been given multiple hearings on counsel issues and opted to represent himself, even after the public defender's office had been reappointed. Id. Offering the defendant counsel at the beginning of the second trial would have resulted in another postponement, and the defendant had already clearly argued that he should be permitted to represent himself. Id. at 266. Thus, the court found that the trial court did not abuse its discretion in failing to renew the offer of counsel as required by rule 3.111(d)(5). Id. Similarly, the facts in the instant case, including Langon's conduct which resulted in the discharge or withdrawal of several attorneys and the trial court's repeated warnings which indicated that the offer would not be renewed for trial, support a conclusion that the court did not abuse its discretion in failing to renew the offer here. Indeed, it is implicit in Faretta that the right to appointed counsel, like the right to self-representation, "is not a license to abuse the dignity of the court or to frustrate orderly proceedings, and a defendant may not manipulate the proceedings by willy-nilly leaping back and forth between the choices." See Jones v. State, 449 So.2d 253 (Fla.1984). We have also recently addressed this issue in McCarthy v. State, 731 So.2d 778 (Fla. 4th DCA 1999). There, we recognized that the trial court was not required to renew an offer of counsel on the day of trial where the court had fully addressed the subject at a pretrial hearing a few weeks earlier. We concluded that it was the hearing that "is properly characterized as the commencement of the trial stage of the proceedings, since it addressed McCarthy's ability to competently handle the mechanics of the trial process on his own." Id.
We also find no abuse of discretion by denying Langon's motion for continuance. Criminal defendants have the right to a reasonable preparation period for trial. See McKay v. State, 504 So.2d 1280 (Fla. 1st DCA 1986). This right, however, is not absolute. At some point, the right bends before countervailing interests involving the effective administration of the courts. Id. at 1282.
Here, the defendant's role in determining the remaining preparation time was great. Langon acknowledged knowing the time needed for preparation when, a month before the trial, he chose to discharge his counsel and represent himself. The case itself was straightforward, and essentially "open and shut," with eyewitness identifications and a videotape of the actual crime. As such, Langon admittedly had only two theoretical defenses, intoxication or temporary insanity. Moreover, Langon was already very familiar with the videotape and had been actively involved in his defense throughout the duration of the proceedings and had previously participated in another trial on the same incident. Therefore, Langon's adequate preparation was not placed at risk, if at all, by virtue of the trial court's decision, but by himself. Cf. Holley v. State, 484 So.2d 634 (Fla. 1st DCA 1986).
Therefore, the judgment and sentence are affirmed.
WARNER, C.J. and GROSS, J., concur.