# Supreme Court of Florida

———————

No. SC12-986

———————

**NORMAN BLAKE MCKENZIE,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

———————

No. SC12-2349

———————

**NORMAN BLAKE MCKENZIE,**
Petitioner,

vs.

**TIMOTHY H. CANNON, etc.,**
Respondent.

[December 11, 2014]

**<u>REVISED OPINION</u>**

PER CURIAM.

Norman Blake McKenzie appeals an order entered in the circuit court

summarily denying his motion to vacate his convictions of first-degree murder and

sentences of death filed pursuant to Florida Rule of Criminal Procedure 3.851. He

also petitions this Court for a writ of habeas corpus. We have jurisdiction. Art. V,

§ 3(b)(1), (9), Fla. Const.

## FACTS AND BACKGROUND

A jury convicted Norman Blake McKenzie of the first-degree murders of

Randy Wayne Peacock and Charles Frank Johnston. McKenzie v. State, 29 So. 3d

272, 277 (Fla. 2010). The jury recommended the death penalty by a vote of ten to

two for each murder. Id. Following that recommendation, the trial court sentenced

McKenzie to death for the murders. Id. at 277-78. After discharging counsel,

McKenzie represented himself during both the guilt and penalty phases of trial, as

well as during the Spencer[1] hearing. Id. at 277. In the opinion affirming the

convictions and sentences, we described the murders, the capital proceedings, and

McKenzie's decision to represent himself:

> [O]n October 5, 2006, two Flagler Hospital employees became
> concerned when Randy Peacock . . . did not report to work. The two
> employees drove to the home that Peacock shared with Charles
> Johnston. Upon their arrival, they noticed that Peacock's vehicle, a
> green convertible, was not there. When the employees entered the
> residence, they found Peacock lying face down on the kitchen floor in
> a pool of blood. When deputies from the St. Johns County Sheriff's
> Office (SJSO) arrived, they . . . located the body of Charles Johnston
> in a shed that was also located on the property. . . . Deputies observed
> a gold sport utility vehicle (SUV) in the driveway and determined that
> it was registered to Norman Blake McKenzie.

1. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

The deputies subsequently spoke with a neighbor of the victims. The neighbor stated that on October 4, 2006, he went to the victims' home to assist Johnston with repairs on his vehicle. When the neighbor first arrived, Johnston was not there but Peacock was present and was speaking with a man whom the neighbor later identified in a photo lineup as McKenzie. . . .

McKenzie subsequently had an encounter with a Citrus County sheriff's deputy during which Randy Peacock's wallet was recovered from one of McKenzie's pockets. Further, Charles Johnston's wallet was located in a vehicle that McKenzie had recently operated. McKenzie agreed to speak with SJSO deputies on two separate occasions during which he confessed to the murders of Peacock and Johnston.

McKenzie explained that he went to the victims' residence on October 4, 2006, to borrow money from Johnston because of his drug addiction. . . . McKenzie then asked Johnston for a hammer and a piece of wood so that he could knock some "dings" out of the door of his SUV. Johnston could not locate a hammer and gave McKenzie a hatchet. While walking into the shed to locate a piece of wood, McKenzie struck Johnston in the head with the . . . hatchet. Johnston fell to the floor and McKenzie struck him again. McKenzie then entered the home, approached Peacock, who was cooking in the kitchen, and struck him with the hammer side of the hatchet approximately two times.

McKenzie returned to the shed, and when he observed that Johnston was still alive, he struck Johnston one or more times with the hatchet. McKenzie removed Johnston's wallet from his pocket . . . and re-entered the residence. McKenzie observed that Peacock was struggling to stand up, so he grabbed a knife and stabbed Peacock multiple times. McKenzie . . . took Peacock's wallet and car keys, and departed in Peacock's vehicle.

. . . .

During a pretrial hearing, McKenzie expressed frustration with his court-appointed counsel because his right to a speedy trial had been waived without first consulting with him. When defense counsel sought a continuance on the basis that more time was needed to prepare for trial, McKenzie objected. McKenzie insisted that he was ready and wanted to proceed as expeditiously as possible. As a result, defense counsel moved to withdraw. The trial court, based upon

McKenzie's assertion that he was ready to proceed, denied the motion and scheduled a trial date.

During a second pretrial hearing, defense counsel again moved for a continuance, asserting that additional time was necessary to prepare for trial and to investigate mitigation. McKenzie again expressed frustration with his court-appointed counsel. . . . When the trial court recommended that McKenzie listen to his attorneys' assertion that more time was required to properly prepare for trial, McKenzie responded that he did not need the assistance of counsel. Based upon this statement, the trial court scheduled a Faretta [n.1] inquiry.

[N.1.] Faretta v. California, 422 U.S. 806 (1975).

During the Faretta hearing, when asked by the trial court why he wanted to represent himself, McKenzie replied that he was ready for trial and did not need attorneys to prepare any sort of mitigation on his behalf. McKenzie also expressed the belief that he possessed sufficient intelligence to represent himself. With regard to his desire to proceed to trial as quickly as possible, McKenzie stated that he did not wish to subject his mother, his fiancée, or the victims' families to an extended trial, and that he thought a protracted trial would be a waste of taxpayer funds.

When the trial court asked McKenzie why he wanted to discharge his court-appointed counsel, McKenzie replied that they insisted upon taking actions with which he disagreed. Defense counsel agreed that McKenzie's displeasure with them arose from a difference of opinion with regard to trial strategy. After conducting a Faretta inquiry, the trial court concluded that McKenzie was competent to waive counsel and that his waiver was knowing, intelligent, and voluntary. The trial court allowed McKenzie to represent himself but appointed standby counsel with McKenzie's approval.

During the guilt phase of the trial, McKenzie admitted that he went to the victims' home on October 4 with the intention of taking their money. McKenzie also admitted that he hit both Johnston and Peacock with the hatchet and stabbed Peacock with a knife. After the State rested its case, McKenzie stated that he would not offer any witness testimony and further declined to testify on his own behalf.

On August 21, 2007, the jury found McKenzie guilty of two counts of first-degree murder.

After the verdict was announced, McKenzie advised that he would like to be represented during the penalty phase and the trial court appointed counsel. However, the next day McKenzie recanted his request and stated that the impact of the verdict caused him to be temporarily distracted from his intended course of action which was to expedite the trial proceedings. The trial court conducted a second Faretta inquiry and again concluded that McKenzie was competent to waive counsel. The trial court allowed McKenzie to represent himself but reappointed standby counsel.

During the penalty phase . . . McKenzie advised that he would not offer any mitigation evidence to the jury. However, following the prosecutor's closing statement, McKenzie was allowed to place bank records into evidence for the purpose of demonstrating his financial behavior in the months before these crimes. By a vote of ten to two, the jury recommended that a sentence of death be imposed for each murder.

McKenzie advised the trial court that he wished to represent himself during the Spencer hearing and that he did not intend to present any witnesses. In light of the minimal mitigation offered by McKenzie, the trial court ordered the Florida Department of Corrections (DOC) to prepare a presentence investigation report (PSI). During the Spencer hearing, the State did not present any additional evidence but discussed the aggravating circumstances that purportedly had been established and also reviewed potential mitigation factors, such as cooperation with law enforcement, cryptic references to child abuse, [n.3] and drug addiction. After stating that he would not expound upon any purported reference to child abuse, McKenzie read a statement that he prepared in which he expressed regret for the murders and apologized to the families of the victims.

> [N.3.] The PSI report prepared by the DOC noted that McKenzie's fiancée "would not discuss [McKenzie's] family. . . . She did state that his parents should be the ones incarcerated and not him. She would not go into any detail."

Id. at 275-77 (footnote omitted).

In sentencing McKenzie to death, the trial court determined that the State had proven beyond a reasonable doubt the existence of four statutory aggravating circumstances with regard to each murder: (1) McKenzie had previously been convicted of another capital felony or of a felony involving the use or threat of violence to the person (eight prior convictions and the contemporaneous murder of the other victim) (great weight); (2) the murders were committed while McKenzie was engaged in the commission of a robbery (significant weight); (3) the murders were committed for pecuniary gain (merged with the robbery aggravator—no additional weight was given); and (4) the murders were committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP) (great weight). Id. at 278.

The court found the existence of nonstatutory mitigating circumstances to include that McKenzie (1) suffered from an addiction to cocaine (little weight); (2) was a victim of child abuse (little weight); (3) exhibited good behavior during trial court proceedings (some weight); (4) expressed remorse (some weight); (5) cooperated with law enforcement (some weight); (6) possesses a GED and certificates in architectural design (very little weight); and (7) is serving a life sentence for armed carjacking, and the minimum mandatory sentence for the murders is life without the possibility of parole (little weight). Id.

The trial court concluded that McKenzie had failed to establish the statutory mitigating circumstance that he was under the influence of an extreme emotional or mental disturbance at the time of the murders.  Id.  Instead, the trial court found "the evidence presented during trial overwhelmingly established that McKenzie was in complete control of his faculties at the time he committed the murders."  Id.  Finally, with regard to sentencing, we explained:

> The trial court concluded pursuant to Muhammad v. State, 782 So. 2d 343 (Fla. 2001), that it could not afford the jury's advisory recommendation great weight in light of McKenzie's minimal presentation of mitigation during the penalty phase.  Accordingly, the trial court conducted an independent evaluation and concluded that the aggravating circumstances established far outweighed the mitigating circumstances.  [n.4]  Based on this conclusion, the trial court imposed a sentence of death for each murder.
>
> [N.4.]  The trial court further concluded that "[e]ven in the absence of [CCP] . . . the remaining aggravating circumstances would far outweigh the mitigating circumstances."

Id.

On direct appeal, McKenzie asserted the following issues: (1) the trial court departed from judicial neutrality when it sua sponte struck a juror for cause; (2) the Faretta and Nelson[2] inquiries were defective and, therefore, the trial court impermissibly allowed McKenzie to represent himself; (3) the trial court improperly restricted McKenzie's access to standby counsel; (4) the trial court

---

2.  Nelson v. State, 274 So. 2d 256 (Fla. 4th DCA 1973).

erred when it prepared one sentencing order to address both murders; (5) the death sentences are not proportionate; (6) Florida's death penalty statute violates Ring v. Arizona, 536 U.S. 584 (2002); (7) the role of the jury during the penalty phase was impermissibly diminished in violation of Caldwell v. Mississippi, 472 U.S. 320 (1985); and (8) the death sentences are unconstitutional because the jury did not issue specific findings with regard to aggravating circumstances and, therefore, it is impossible to determine whether the jury determination was unanimous with regard to the aggravating circumstances that applied. McKenzie, 29 So. 3d at 279-88. This Court denied relief on all claims and affirmed McKenzie's convictions and sentences. Id. at 288. The United States Supreme Court subsequently denied certiorari review. McKenzie v. Florida, 131 S. Ct. 116 (2010).

On September 15, 2011, McKenzie filed a motion to vacate the convictions and sentences pursuant to Florida Rule of Criminal Procedure 3.851, asserting four claims. The first claim alleged that due to State action, McKenzie was denied a full and fair capital sentencing phase, and the postconviction court should now consider McKenzie's mitigation evidence to determine whether his death sentences are constitutional. The "State action" in question was divided into multiple subparts and can be summarized as follows: (1) appointed counsel were ineffective during the time they represented McKenzie because they failed to properly visit him in custody and sufficiently consult with him before waiving his right to a

speedy trial; counsel also failed to adequately explain the capital sentencing process; (2) McKenzie was not offered the assistance of a mental health expert pursuant to Ake v. Oklahoma, 470 U.S. 68 (1985), and counsel were ineffective for failing to ask for the appointment of an expert prior to their discharge; (3) McKenzie had a constitutional right to compel witnesses to testify on his behalf but was not permitted to do so; (4) McKenzie was denied his right of access to courts because he was not given access to a law library; (5) McKenzie was denied the right to present mitigation when he attempted to model his defense after the presentation by the prosecution, but the prosecutor blocked introduction of the mitigation by objection; (6) the prosecutor's use of McKenzie's opening statement as substantive evidence violated the Confrontation Clause of the United States Constitution; (7) the prosecutor improperly visited McKenzie in jail without a court reporter present and, during the visit, falsely informed McKenzie that he could not introduce statements from his first recorded interrogation by law enforcement officers; (8) the prosecution's failure during trial to play two recorded interrogations of McKenzie prevented the jury and the trial court from considering existing mitigation, and McKenzie was never given copies of the interrogations; (9) the PSI prepared by the DOC was deficient; and (10) without full consideration of McKenzie's drug abuse, his mental illness, and developmental factors, the death sentences are unconstitutional.

In his second claim, McKenzie reiterated that his counsel were ineffective, which led McKenzie to choose to represent himself. Under this claim, McKenzie quoted extensively from a report prepared by a clinical and forensic psychologist and listed twenty-five "distinct toxic formative influences and compromising factors" that should have been presented during the penalty phase.[3] According to the psychologist, each of these influences or factors presented "malignant implications for Mr. McKenzie's life trajectory and participation in the capital offense." McKenzie's third claim challenged the constitutionality of Florida's lethal injection procedure and statute. His final claim challenged the constitutionality of Florida's death penalty statute in light of the Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466 (2000).

---

3. The twenty-five factors are: (1) trans-generational family dysfunction and distress; (2) hereditary predisposition to psychological disorder and personality pathology; (3) hereditary predisposition for alcohol and drug abuse/dependence; (4) fetal cigarette exposure; (5) fetal alcohol exposure; (6) pregnancy and birth complications; (7) childhood symptoms consistent with Attention Deficit Hyperactivity Disorder; (8) inhalant abuse; (9) alcohol and drug abuse; (10) chronic stress in childhood; (11) Hepatitis C and HIV status; (12) mother in mid-teens at parenting onset; (13) physical and psychological abuse; (14) functional abandonment by father; (15) physical and emotional neglect post-divorce; (16) perverse family sexuality and probable family-context sexual abuse; (17) observed family violence; (18) mother's alcohol abuse; (19) corruptive and alcoholic stepfather figures; (20) corruptive influence of siblings; (21) traumatic sexual exposures and abuse; (22) availability of alcohol and illicit drugs; (23) childhood onset alcohol and drug abuse; (24) substance-related offending and incarceration in early adulthood; and (25) cocaine-induced psychological decompensation and extended sleep deprivation at the time of the offense, in a temporal context of psychotic symptoms.

The postconviction court held a <u>Huff</u>[4] hearing, and on March 8, 2012,

summarily denied McKenzie's motion without an evidentiary hearing. McKenzie

now appeals the summary denial, challenging the trial court's ruling on his first

and second postconviction claims (and all incorporated subclaims), and has also

petitioned this Court for a writ of habeas corpus.

## ANALYSIS

### Standard of Review

This Court has explained the standard of review of a summarily denied

initial motion for postconviction relief as follows:

> "A defendant is normally entitled to an evidentiary hearing on a
> postconviction motion 'unless (1) the motion, files, and records in the
> case conclusively show that the movant is entitled to no relief, or (2)
> the motion or particular claim is legally insufficient.' " <u>Valentine v.
> State</u>, 98 So. 3d 44, 54 (Fla. 2012) (quoting <u>Franqui v. State</u>, 59 So.
> 3d 82, 95 (Fla. 2011)). An evidentiary hearing must be held on an
> initial 3.851 motion whenever the movant makes a facially sufficient
> claim that requires factual determination. <u>See</u> <u>Amendments to Fla.
> Rules of Crim. Pro. 3.851, 3.852, & 3.993</u>, 772 So. 2d 488, 491 n.2
> (Fla. 2000). "[T]o the extent there is any question as to whether a rule
> 3.851 movant has made a facially sufficient claim requiring a factual
> determination, the Court will presume that an evidentiary hearing is
> required." <u>Walker v. State</u>, 88 So. 3d 128, 135 (Fla. 2012). However,
> merely conclusory allegations are not sufficient—the defendant bears
> the burden of "establishing a 'prima facie case based on a legally valid
> claim.' " <u>Valentine</u>, 98 So. 3d at 54 (quoting <u>Franqui</u>, 59 So. 3d at
> 96).
> "To uphold the trial court's summary denial of claims raised in
> an initial postconviction motion, the record must conclusively

---

4. <u>Huff v. State</u>, 622 So. 2d 982 (Fla. 1993).

- 11 -

demonstrate that the defendant is not entitled to relief." Everett v. State, 54 So. 3d 464, 485 (Fla. 2010). When reviewing the circuit court's summary denial of an initial rule 3.851 motion, we will accept the movant's factual allegations as true and will affirm the ruling only if the filings show that the movant has failed to state a facially sufficient claim, there is no issue of material fact to be determined, the claim should have been brought on direct appeal, or the claim is positively refuted by the record. See Walker, 88 So. 3d at 135. Finally, "[b]ecause a court's decision whether to grant an evidentiary hearing on a rule 3.851 motion is ultimately based on written materials before the court, its ruling is tantamount to a pure question of law, subject to de novo review." Seibert v. State, 64 So. 3d 67, 75 (Fla. 2010) (citing State v. Coney, 845 So. 2d 120, 137 (Fla. 2003) (holding that pure questions of law that are discernable from the record are subject to de novo review)).

Barnes v. State, 124 So. 3d 904, 911 (Fla. 2013).

**Ineffective Assistance of Trial Counsel**

McKenzie first claims that, prior to their discharge, appointed counsel were deficient because they failed to meet with him at one of the various locations where he was being held in custody to discuss the waiver of speedy trial and the capital sentencing process. Based upon this purported deficiency, McKenzie contends that he acted impulsively and decided to represent himself, which led to mitigation not being introduced. We conclude that the trial court properly denied this claim.

On direct appeal, this Court specifically noted that an attorney may waive speedy trial without consulting the client and even against the client's wishes. McKenzie, 29 So. 3d at 282; see also State v. Kruger, 615 So. 2d 757, 759 (Fla. 4th

- 12 -

DCA 1993). Thus, if the right to speedy trial may be waived without consulting the defendant, counsels' waiver here cannot be considered an error, let alone one that is "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland v. Washington, 466 U.S. 668, 687 (1984). Further, McKenzie's initial and reply briefs fail to present a case in which counsel was deemed constitutionally deficient solely for failing to visit a criminal defendant before waiving the right to a speedy trial, and our research reveals no supporting precedent. Accordingly, McKenzie's allegation of deficiency is not supported in the law, and he has failed to satisfy the first prong of Strickland.[5]

McKenzie next claims that he was prejudiced by counsels' failure to visit him because, had such visits occurred, he would not have acted impulsively and elected to represent himself. This claim is not only speculative, but positively refuted by the record. See Barnes, 124 So. 3d at 911. The record on direct appeal reflects that McKenzie was determined to go to trial as quickly as possible and, despite urgings from the trial court that he listen to counsel, would not be swayed from this course of action. During a pretrial hearing, McKenzie informed the trial court:

5. Contrary to the blatant misrepresentation in McKenzie's motion for rehearing, this Court does not hold—and never has held—that trial counsel has no obligation to meet with a client and can never be deemed ineffective for failing to meet with a client. Instead, the analysis clearly reflects that our holding is limited to the context of speedy trial waivers.

> I have been here ready to go to trial from the time that I
> was booked on this charge. . . . There's been plenty of
> time—there's nothing—this case is a cut-and-dry case.
> You can ask the prosecutor that. There's not a lot to do,
> okay. I've been found competent by another—by my
> evaluation, there's no reason for this to continue on the
> way it is. None at all. And if the state's willing to take
> me to trial, then let's go to trial.

(Emphasis supplied.) McKenzie insisted that he was ready for trial because there was no discovery to be completed, stating "There's no depositions to be made. I was the only one present during the murders when they occurred, how can there be a deposition to be made? . . . You can't depo a dead person." During a later pretrial hearing, McKenzie again expressed frustration with his counsel based upon their second request for a continuance. When the trial court recommended that McKenzie listen to counsel when they informed him that they were not ready to proceed to trial, McKenzie responded, "if that's your advice, I don't—I don't need them."

During the Faretta hearing, when asked by the trial court why he wanted to represent himself, McKenzie replied that he was ready for trial and did not need attorneys to prepare any mitigation on his behalf. McKenzie also expressed the belief that he possessed sufficient intelligence to represent himself, stating:

> I'm intelligent enough. I'm aware of what's going on. I'm aware of
> the severity of the charges. I'm aware of the severity of the
> consequences of being found guilty. I understand every bit of it. I
> know the ramifications of what's taking place.

With regard to his desire to proceed to trial as quickly as possible, McKenzie stated:

> I just don't feel that it's necessary for me to drag this out through the courts and cause the taxpayers to spend more and more money on this. I really don't. There's just—there's, there's not a lot to do in this case. There isn't. I understand that it's a severe case. I'm not trying to alleviate the severity of this case at all. And I know that my life is on the line here. I understand that.
> . . . .
> <u>I don't want to sit here and drag my fiancée through all this. I don't want to have my mother dragged through all this, okay? . . . I don't want to have the victim's [sic] family dragged through all this and have them have to suffer through it all. I don't.</u>
> <u>But I will put an end to this as fast as possible, as quick as possible.</u>

(Emphasis supplied.)

McKenzie's own statements during these pretrial hearings establish that visits by counsel to discuss the strategy to defend and the need for a waiver of speedy trial would not have been productive. McKenzie's assertion on rehearing that we have somehow improperly discerned his intent is puzzling indeed, as the prior quotes from the record on direct appeal <u>are those of McKenzie himself</u>. They reflect that McKenzie's express intent with regard to resolving the murder charges expeditiously was to spare his fiancée, his mother, and the victims' families the anguish of a prolonged trial. He acknowledged that the case was straightforward, informed the court that he had been ready for trial since he was "booked," and expressed his belief that enough time had passed since his arrest. Based upon these

- 15 -

statements by McKenzie, we hold there is no reasonable probability that, had counsel visited him prior to waiving speedy trial, McKenzie would have acquiesced to this decision and proceeded to trial with representation.

Moreover, even if McKenzie had been represented by counsel, during trial two detectives testified with regard to McKenzie's highly detailed confessions. McKenzie admitted that he committed the murders because he wanted money to purchase drugs. Given the viciousness of the murders with a hatchet and a knife, the fact that McKenzie actually tricked one of the victims into giving him a murder weapon, and McKenzie's extensive violent criminal history, there is no reasonable probability that, had McKenzie been represented by counsel, and mental health and addiction evidence introduced, the result of the penalty phase would have been different, and our confidence in the outcome has not been undermined. See Strickland, 466 U.S. at 694 (to establish prejudice based upon a claim of ineffective assistance of counsel, a defendant must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.").[6] Accordingly, McKenzie has also failed to establish the second prejudice prong of Strickland.

---

6. McKenzie's assertion on rehearing that the mitigation presented in his postconviction motion would have motivated at least four additional jury members to recommend life sentences constitutes pure speculation.

We affirm the summary denial of this subclaim.

## Mental Health Expert

In <u>Ake</u>, the Supreme Court held that "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." 470 U.S. at 83. It further concluded that "where the consequence of error is so great, the relevance of responsive psychiatric testimony so evident, and the burden on the State so slim, due process requires access to a psychiatric examination on relevant issues, to the testimony of the psychiatrist, and to assistance in preparation at the sentencing phase." <u>Id.</u> at 84. This Court has consistently held that <u>Ake</u> claims are procedurally barred if they are not presented on direct appeal. <u>See, e.g.</u>, <u>Anderson v. State</u>, 18 So. 3d 501, 519 (Fla. 2009); <u>Whitfield v. State</u>, 923 So. 2d 375, 379 (Fla. 2005); <u>Marshall v. State</u>, 854 So. 2d 1235, 1248 (Fla. 2003). McKenzie did not present an <u>Ake</u> challenge in this case on direct appeal, and this subclaim is barred.

Moreover, this claim also lacks merit. The trial court, in rejecting the statutory mitigating circumstance that McKenzie was under the influence of an extreme mental or emotional disturbance at the time of the murders, specifically stated in the sentencing order:

> The fact that the Defendant may wish to have this mitigating circumstance considered based on his statement to the court that he was intoxicated at the time he committed the murders, does not overcome the other evidence in the case that establishes in overwhelming fashion that the <u>Defendant was in complete control of his faculties when these heinous crimes were committed</u>.

(Emphasis supplied.)  The record on direct appeal reflects that McKenzie never requested the appointment of an expert during the guilt or penalty phases to investigate the existence of mental health mitigation or any other psychological matter.  Whether to request the assistance of an expert, or present any mitigation evidence other than his bank records, was exclusively McKenzie's decision after he knowingly, intelligently, and voluntarily waived his right to counsel, assumed full control of his case, and chose to represent himself.  Moreover, during the penalty-phase <u>Faretta</u> inquiry, the trial court expressly informed McKenzie he would not receive special treatment if he chose to represent himself, and McKenzie acknowledged that he understood.  He cannot now assert, and no evidence supports his claim, that the trial court had an affirmative duty to offer or demand for him the assistance of a mental health expert pursuant to <u>Ake</u> during the penalty phase.

Similarly, McKenzie's claim that counsel were ineffective for failing to request the appointment of a mental health expert prior to their discharge fails.  As previously noted, after the jury rendered guilty verdicts, McKenzie stated that he wished to be represented by counsel during the penalty phase.  After the trial court appointed counsel for McKenzie, counsel disclosed that prior to McKenzie's initial

decision to represent himself, they requested an evaluation to "determine whether he was competent to stand trial." During a pretrial hearing, McKenzie also stated, "I'm sorry, Your Honor, but [counsel] has two evaluations by a psychiatrist already. He can turn those over to you right now to show you that I'm competent." Thus, McKenzie was found to be competent both in an evaluation sought by counsel and by the trial court during multiple Faretta inquiries.

In alleging that counsel were ineffective, McKenzie ignores the fact that he was found to be competent to represent himself, and he chose not to present mitigation evidence during the penalty phase other than the bank records. Had counsel requested the appointment of a mental health expert prior to their discharge, McKenzie's unequivocal statements and conduct throughout the trial both demonstrate that he would have refused to submit to an evaluation because it would have delayed the trial, and that would have been directly contrary to his express intent to expedite the proceedings.

There was nothing in the record to indicate to counsel or the trial court that McKenzie's mental health status was or would be a legitimate issue or a significant factor in the case. Accordingly, McKenzie has failed to establish both the deficiency and prejudice prongs of Strickland.

We affirm the summary denial of this subclaim.

**Witnesses**

This subclaim arises from McKenzie's decision to represent himself. We have previously cautioned that a defendant who elects to proceed without counsel is entirely responsible for his own defense, even if he has standby counsel. See Behr v. Bell, 665 So. 2d 1055, 1056-57 (Fla. 1996). A defendant who chooses to represent himself cannot later complain that the quality of his defense was substandard or amounted to ineffective assistance of counsel. See id.

Although McKenzie contends that he was denied the opportunity to compel witnesses on his behalf, he fails to provide the name of a single witness whom he sought to present but was precluded from doing so by either the trial court or the State. McKenzie never sought to invoke any process whatsoever. With regard to the right to compulsory process for obtaining witnesses guaranteed by the Sixth Amendment, the Supreme Court has stated that this right must be initiated by the defendant:

> There is a significant difference between the Compulsory Process Clause weapon and other rights that are protected by the Sixth Amendment—its availability is dependent entirely on the defendant's initiative. Most other Sixth Amendment rights arise automatically on the initiation of the adversary process and no action by the defendant is necessary to make them active in his or her case. While those rights shield the defendant from potential prosecutorial abuses, the right to compel the presence and present the testimony of witnesses provides the defendant with a sword that may be employed to rebut the prosecution's case. The decision whether to employ it in a particular case rests solely with the defendant. The very nature of the right requires that its effective use be preceded by deliberate planning and affirmative conduct.

Taylor v. Illinois, 484 U.S. 400, 410 (1988) (emphasis supplied) (footnote omitted). While representing himself, McKenzie chose not to present any witnesses—mental health or otherwise. He had the opportunity to do so, but he simply did not take advantage of that process. Accordingly, he cannot now assert that his right to compulsory process and to compel witnesses was violated.

The postconviction court properly denied this subclaim without an evidentiary hearing.

### Access to Law Library

During the Faretta inquiry, the trial court warned McKenzie that if he chose to represent himself, he would be more limited than an attorney in researching his defense. McKenzie confirmed to the trial court that he understood this ramification of self-representation. Although McKenzie informed the court during the inquiry that he had "no library privileges," McKenzie does not allege that he ever asked the staff at the jail for library privileges, that jail staff denied him such access, that he brought such a denial to the attention of the trial court, or that the trial court did nothing to ensure McKenzie the access he sought. Cf. Langon v. State, 791 So. 2d 1105, 1109-10 (Fla. 4th DCA 1999) ("At a status conference . . . Langon moved for access to video tapes and his files, as well as increased access to the law library. Langon also moved for a continuance in order to review these items and prepare for trial. . . . The court denied Langon's motion for a

continuance and instructed the sheriff's office to bring the tapes and files to Langon's cell."). Because McKenzie chose to represent himself, he was responsible for alerting the trial court to any difficulties he encountered in accessing legal materials. There is no indication in the record that McKenzie was denied access to any legal materials he sought. Therefore, this subclaim is conclusively refuted by the record, and summary denial was proper.

**Prosecutorial Misconduct**

Under this claim, McKenzie asserts that the State allegedly sabotaged his case in multiple ways. McKenzie first claims that the prosecution improperly relied on his guilt phase opening statement as substantive evidence during its guilt phase closing statement, and this conduct violated the Confrontation Clause. As a preliminary matter, McKenzie did not object to the prosecutor's closing statement of which he now complains, and this issue has not been preserved. Further, an allegation of improper argument by the prosecution is procedurally barred if not asserted on direct appeal. See Ferrell v. State, 29 So. 3d 959, 977 (Fla. 2010); Kelley v. State, 569 So. 2d 754, 756 (Fla. 1990).

Moreover, even if preserved, we conclude that no improper argument or Confrontation Clause violation occurred. During his opening statement, McKenzie told the jury in great detail how and why the murders occurred:

> I'm here before you being tried for two crimes which occurred on October 4th at about dusk. My intention, in this opening

- 22 -

statement, is twofold: To take up the least amount of your time as possible, and give you a clear understanding of the crime that took place. Only I can do this. Though the prosecution can, and will, no doubt, put before you an excellent case, only I can truly bring you into the horror of the evening of October 4th, 2006.

. . . .

At approximately 3:00 p.m. on October 4th, 2006, needing some money, I contemplated on how I could get some. I was working for Randy Peacock and Charles Johnston. . . . I knew that they had some money; I wasn't sure how much. I had drove to their house <u>with the intention of physically depriving them of their money</u>.

. . . .

I asked . . . Charles Johnston if he had a hammer. You can't see the damage to my truck . . . but there is damage on the other side . . . . It was my intention to utilize the hammer and a piece of wood to bang out the dent as much as possible to be able to open up the driver's side door as much as possible without doing further damage to the vehicle, <u>as well as get a weapon in my hand</u>.

. . . On this table is where the hatchet was given to me at that time. He gave me the hatchet because it has a flat side to it. . . . I was given a hatchet. I needed a piece of wood. He searched upon the carport and couldn't find one. I knew that there was wood laying in the back of the home, from previous work that I had done around the home, and I said "come on, we can find a piece of wood back there easily." He still searched around the front. I don't know if he felt something wrong or what, but I kind of sensed that he did, and I finally talked him into getting—I know there's one, you know, right around the corner, and we walked back there and went into the shed. . . . And he walked in and I walked in behind him. . . . <u>I struck Charles Johnston one time in the back of the head with the . . . flat part of the hatchet</u>, not the blade side, probably about right there. He fell down, knocking down a lot of the shelves. . . .

. . . .

I walked into the front door. Randy Peacock was standing in the kitchen, cooking a pot of chicken soup. And I walked up behind him and <u>I struck him one time in the top, the back of his head, once again . . . with the flat part of the hatchet</u>. Basically about the same spot that I hit Charles Johnston at. . . .

He fell forward, on both elbows, about like that, directly into the pot of chicken soup, with the soup still maintaining where it was

being cooked at on the stove.  He didn't fall over, but he was knocked out.  And he didn't cry out in pain.  He was knocked out.  And . . . I was puzzled why he wouldn't fall, and then I realized that he was balanced perfectly there, knocked out, leaning with his arms in the pot.

(Emphasis supplied.)  At this point, the trial court informed McKenzie that he should tell the jury what he expected the evidence to show, "as opposed to giving a statement."

According to McKenzie, the Confrontation Clause violation occurred when the prosecutor made the following comments during guilt phase closing statements:

> . . . All of those injuries and all of that blood and all of that viciousness because Norman Blake McKenzie, as he told you in his own words in his opening statement, wanted these items and wanted a car to get away for his own purposes.
> Ladies and gentlemen, the evidence has clearly shown you, beyond any doubt, that this defendant is guilty of both counts of murder in the first degree.  It's a rare case, it's a unique case where you hear from the defendant, right off the beginning of the case, that's represented himself here, but still, the State has to prove every element of each of those counts beyond and to the exclusion of every reasonable doubt.
> Norman McKenzie stood up, and in his own words in his opening statement, told you what that evidence would show, but the most compelling thing he told you was that not one single witness that would take the stand could know the horror of that day, that he was the only one that knew the horror of that day, and the truth of his own words to you has been the truth of this entire case throughout yesterday and today.
> . . . .
> . . . And Mr. McKenzie told you himself in his opening that the evidence would show that [Randy Peacock] was there for just a little while, he was sort of balanced there in that position.  So forethought

about why—why was he still there, and then more injuries to that man with a different instrument. And those are the circumstances, ladies and gentlemen, you must consider based on Florida's law.

Despite McKenzie's assertion that his opening statement was relied upon by the prosecution as substantive law, the quote above reflects the prosecution specifically informed the jury that the State had the burden of proving McKenzie's guilt "beyond and to the exclusion of every reasonable doubt." Further, McKenzie omitted from his initial brief a portion of the State's closing statement, which followed the paragraph above that ends with the words "yesterday and today":

> Ladies and gentlemen, we didn't show you a lot of pictures or spend a lot of time on them. <u>We showed you what we needed to to prove the elements of our case. It's our job</u> . . . to show you that Randy Wayne Peacock, who was in his own kitchen cooking chicken soup, died this death, and under the law of the state of Florida, this is a premeditated murder.

(Emphasis supplied.) The record also reflects that during the guilt phase, the State presented as witnesses two detectives who heard McKenzie's confessions. Those detectives testified in great detail to the facts of the murders as they were conveyed by McKenzie. Finally, before opening statements were given, the trial court informed the jury that "[w]hat the lawyers say, and what Mr. McKenzie says, <u>is not evidence</u>, and you are not to consider it as such during the opening statement" (emphasis supplied). The court later instructed the jury "[i]t is up to the State to prove the defendant's guilt by evidence," and "[i]t is to the evidence introduced in this trial and to it alone that you are to look for that proof."

Accordingly, the record conclusively refutes McKenzie's allegation that the prosecutor improperly relied upon his opening statement as evidence. Rather, the State expressly noted during closing statements that it carried the burden of establishing McKenzie's guilt of the crimes, and the trial court affirmed this principle in its instructions. Moreover, during the guilt phase, the State presented ample evidence of McKenzie's guilt and did not rely upon McKenzie's opening statement. Lastly, although McKenzie claims that "the State used his opening statements to argue its case despite a lack of confrontation of those statements," no authority has been presented to support the principle that a criminal defendant can assert a Confrontation Clause challenge to a statement when the defendant is the one who voluntarily made the statement. This allegation of misconduct fails.

McKenzie's remaining claims of prosecutorial misconduct arise from the perils of self-representation. These claims are (1) the prosecutor improperly objected to McKenzie's closing statements, thereby preventing McKenzie from presenting evidence in mitigation;[7] and (2) the prosecutor visited McKenzie in jail

---

7. McKenzie cites the following exchanges in support of this subclaim:

MCKENZIE: I don't believe that under any circumstances at this time right now could this crime have ever occurred in my state of mind as I am right now. Never.
Demonstrating a depraved mind without regard for human life. Did I go there to get that? Yes, [I] did. I did. Could I do that now? No.

without a court reporter present[8] and allegedly informed him that during trial, he could not introduce statements from his first interrogation by law enforcement. Had McKenzie been represented, counsel would have (1) presented opening and closing statements that properly commented on the evidence offered during trial; and (2) advised McKenzie as to the admissibility of statements made during the first interrogation and whether those statements would be beneficial or detrimental to McKenzie's case. However, McKenzie chose to represent himself and, therefore, he was responsible for his entire defense. Behr, 665 So. 2d at 1056-57. As a result, any misinterpretation of the law or misunderstanding of trial procedure

---

STATE: Your Honor, I'm going to have to object because it's not about what Mr. McKenzie could do now; it's about what happened on the day of the crime.

COURT: I'm going to sustain the objection. Mr. McKenzie, you have to comment on the evidence.

MCKENZIE: Yes, ma'am.

(Guilt phase closing statement.)

MCKENZIE: Some things occurred in my childhood that in the beginning I didn't know was wrong, and I remember—

STATE: I'm sorry, Your Honor. At this point I'm going to have to object.

(Penalty phase closing statement.)

8. McKenzie cites no legal authority for the proposition that a prosecutor who visits a pro se criminal defendant in jail is legally required to have a court reporter present.

- 27 -

and the rules of evidence by McKenzie were exclusively due to his actions. We hold that the postconviction court properly denied this subclaim.[9]

## Interrogation Recordings

In response to a notice of discovery filed by McKenzie's counsel prior to their discharge, the State filed a "Discovery Exhibit." Listed in that exhibit is "Electronic surveillance of conversations." Thus, McKenzie was on notice that electronic copies of his two interrogations existed, and he could have requested that they be provided to him. Had McKenzie acquired and reviewed the recordings, he could have played them for the jury, argued to the jury or the trial court that they provided compelling evidence of mental health and addiction mitigation, and used them to rebut the detectives' testimony. However, McKenzie took no steps to acquire the recordings. Accordingly, the failure of the jury and the trial court to view the recordings can only be attributed to McKenzie, and not to any misconduct by the State.

We hold that the postconviction court properly denied this subclaim without an evidentiary hearing.

## Deficient PSI

---

9. McKenzie's assertion on rehearing that our holding condones "prosecutors engag[ing] in all sorts of misconduct when seeking a death sentence of a pro se defendant" is based upon the false and misguided premise that the State engaged in improper conduct during the trial proceedings.

Because of the minimal mitigation offered by McKenzie, the trial court ordered the preparation of a PSI by the DOC.[10] McKenzie now contends that this report was deficient because it did not contain any reference to the recorded confessions, his mental health, or his social history. However, during the Spencer hearing McKenzie was provided a copy of the PSI, and the trial court insisted that he read it, stating "I want you to sit down there and I want you to read through it. We've got all morning." After, the trial court asked McKenzie if there was anything incorrect, or anything that should be added. McKenzie replied "no," other than requesting that the amount of his estimated monthly expenses be changed. McKenzie did not alert the trial court to the lack of information in the PSI similar to what he now asserts should have been included. To the contrary, before reading his prepared statement during the Spencer hearing, the following dialogue occurred:

> MCKENZIE: . . . [The prosecution] made a slight reference to some experiences, however traumatic or not they may have been, in my childhood. I'm not going to expound upon that at all.
>
> COURT: You don't wish to offer any of that mitigation?
>
> MCKENZIE: No, I don't. I just, I don't. I'm not going to— I'm not going to go through that, you know.

---

10. In his motion for rehearing, McKenzie curiously claims that we have somehow misunderstood that "the PSI was not a report by Mr. McKenzie but a report about Mr. McKenzie." This assertion makes no sense in light of the above sentence.

(Emphasis supplied.) Thus, McKenzie had no desire for his social history to be presented to the trial court for consideration as mitigation. This was McKenzie's decision while he acted as his own counsel. Further, as discussed in the prior subclaim, McKenzie had notice of the recordings of his prior statements to law enforcement. If McKenzie had wanted the trial court to consider these recordings as possible drug abuse or mental health mitigation, he could have simply requested them and had them presented during the <u>Spencer</u> hearing, or even requested that the interrogations be presented during trial. He did not do so.

Accordingly, any claims of deficiency with regard to the interrogations or the PSI are waived at this juncture because (1) the trial court asked McKenzie if anything was missing from the report, and McKenzie replied in the negative; (2) McKenzie was on notice that the interrogation recordings existed, but did nothing to bring them to the court's attention; and (3) McKenzie expressly informed the trial court that he did not wish to present any mitigation with regard to his childhood. Based on the foregoing, the postconviction court properly denied this subclaim without an evidentiary hearing.

**Summation**

A number of the subclaims presented in the first issue on appeal arise from McKenzie's decision to represent himself during his capital criminal proceeding. Based upon his knowing, intelligent, and voluntary waiver of his right to counsel,

and due to either inadvertence, lack of legal experience, or a definitive decision, evidence that might have been considered by the jury or the trial court as mitigation was not presented. The fact that McKenzie may have made ill-advised decisions while he represented himself does not establish that he is entitled to a "do-over" of his penalty phase or any phase of his underlying trial in the postconviction context. If this approach was adopted, many competent capital defendants would elect to represent themselves during trial as a delaying tactic. Instead, the cautionary statement in Behr applies with equal force here: "[A] defendant who represents himself has the entire responsibility for his own defense, even if he has standby counsel. Such a defendant cannot thereafter complain that the quality of his defense was a denial of 'effective assistance of counsel.' " 665 So. 2d at 1056-57 (quoting Faretta, 422 U.S. at 835 n.46). In light of the foregoing, we affirm the summary denial of the subclaims presented in McKenzie's first postconviction claim.

Additionally, because McKenzie's second claim on appeal essentially constitutes a presentation of the mitigation evidence that McKenzie would have offered if this Court had granted him relief on his first claim, we reject this claim as well. Contrary to McKenzie's misrepresentation on rehearing, our analysis has not discounted "expertise in psychology and addiction." Rather, we reiterate that McKenzie had no desire to present experts in these fields while he acted as his own

counsel, and his belated attempt to do so during the postconviction proceedings was improper. Based upon the evidence that McKenzie chose to introduce during the penalty phase, this Court on direct appeal conducted a full proportionality review with regard to the death sentences imposed by the trial court. See McKenzie, 29 So. 3d at 286-87. Accordingly, to claim on rehearing that no such review occurred is misleading at best, and false at worst. McKenzie is not entitled to a second proportionality review at the postconviction appellate stage for evidence that he chose not to present during his capital trial.

Finally, because there is no error by the postconviction court, McKenzie's claim of cumulative error fails. See Lukehart v. State, 70 So. 3d 503, 524 (Fla. 2011) ("This Court has repeatedly held that where the alleged errors, when viewed individually, are 'either procedurally barred or without merit, the claim of cumulative error also necessarily fails.' " (quoting Israel v. State, 985 So. 2d 510, 520 (Fla. 2008)).

**Habeas Corpus Petition**

In the sole issue presented in the habeas petition, McKenzie claims that because he is mentally ill, to execute him would be unconstitutional. However, regardless of whether McKenzie actually suffers from mental illness, we have previously held that mental illness alone does not operate as an absolute bar to execution. See, e.g., Power v. State, 992 So. 2d 218, 222 (Fla. 2008) ("[N]either

- 32 -

this Court nor the Supreme Court has recognized mental illness as a per se bar to execution." (quoting Diaz v. State, 945 So. 2d 1136, 1151 (Fla.), cert. denied, 549 U.S. 1103 (2006)). Further, in 2011 this Court rejected a claim that execution of the mentally ill is inconsistent with "evolving standards of decency in death penalty jurisprudence." Johnston v. State, 70 So. 3d 472, 484 (Fla. 2011). Accordingly, this claim is without merit, and McKenzie is not entitled to habeas relief.

## CONCLUSION

For the foregoing reasons, we affirm the denial of the rule 3.851 motion and deny the petition for writ of habeas corpus.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, and PERRY, JJ., concur.
CANADY, J., concurs in result.

NO MOTION FOR REHEARING WILL BE ALLOWED.

Two Cases:

An Appeal from the Circuit Court in and for St. Johns County,
    Wendy Williams Berger, Judge - Case No. 552006CF001864XXAXMX
And an Original Proceeding – Habeas Corpus

James Lawrence Driscoll, Jr. and David Dixon Hendry of Capital Collateral Regional Counsel-Middle Region, Tampa, Florida,

    for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Mitchell David Bishop, Assistant Attorney General, Daytona Beach, Florida,

for Appellee/Respondent